UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Dino N. Theodore and
Access with Success, Inc.,
    Plaintiffs

      v.                            Case No. 18-cv-368-SM
                                         Opinion No. 2019 DNH 174
99 Restaurants, LLC;
99 West, LLC; and
Double 9 Property III, LLC,
    Defendants


**O R D E R**


Plaintiffs, Access with Success, Inc., and one of its directors, Dino Theodore, determined that various design/architectural elements in and around defendants' 99 Restaurant in Salem, New Hampshire, failed to comply with requirements of Title III of the Americans with Disabilities Act. They sought "a permanent injunction . . . requiring the defendants to alter the 99 Restaurant & Pub [in Salem, New Hampshire] . . . in order to render their restaurant readily accessible to and useable by individuals with disabilities . . . to the extent required by the Americans with Disabilities Act." Amended Complaint (document no. 22) at 17-18. In response to plaintiffs' complaint, defendants say they have since made substantial renovations to the restaurant and have remedied all

alleged ADA violations.  Accordingly, defendants now move for
summary judgment, asserting that plaintiffs' claims are moot.
Plaintiffs object and move for "partial summary judgment,"
vaguely claiming that unspecified "architectural barriers to
equal access still exist at The 99" and the "non-compliant
conditions have not been remediated."  Plaintiffs' Memorandum of
Law (document no. 36-1) at 15.

   For the reasons discussed, plaintiffs' motion for partial
summary judgment (document no. 36) is denied, and defendants'
motion for summary judgment (document no 42) is granted.

## Standard of Review

   When ruling on a motion for summary judgment, the court is
"obliged to review the record in the light most favorable to the
nonmoving party, and to draw all reasonable inferences in the
nonmoving party's favor."  Block Island Fishing, Inc. v. Rogers,
844 F.3d 358, 360 (1st Cir. 2016) (citation omitted).  Summary
judgment is appropriate when the record reveals "no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this
context, a factual dispute "is 'genuine' if the evidence of
record permits a rational factfinder to resolve it in favor of
either party, and 'material' if its existence or nonexistence

has the potential to change the outcome of the suit." <u>Rando v.</u>
<u>Leonard</u>, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted).
Consequently, "[a]s to issues on which the party opposing
summary judgment would bear the burden of proof at trial, that
party may not simply rely on the absence of evidence but,
rather, must point to definite and competent evidence showing
the existence of a genuine issue of material fact." <u>Perez v.</u>
<u>Lorraine Enters.</u>, 769 F.3d 23, 29–30 (1st Cir. 2014).  In other
words, "a laundry list of possibilities and hypotheticals" and
"[s]peculation about mere possibilities, without more, is not
enough to stave off summary judgment." <u>Tobin v. Fed. Express</u>
<u>Corp.</u>, 775 F.3d 448, 451–52 (1st Cir. 2014). <u>See generally</u>
<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).


**Background**

     Defendants' restaurant (the "Salem 99 Restaurant") is in a
shopping plaza in Salem, New Hampshire.  According to the
amended complaint (which defendants do not dispute), the entire
shopping plaza includes roughly 1,000 parking spaces.  As
originally constructed in about 1975, the Salem 99 Restaurant
was required, by local zoning ordinance, to maintain 60 parking
spaces for its patrons.  In 1992, the restaurant constructed a
700 square foot addition, which allows it to currently
accommodate 240 customers.  When that addition was built, the

Salem zoning ordinance required the restaurant to increase the number of parking spaces available to its customers from 60 to 97. Plaintiffs do not suggest that the Salem 99 Restaurant is legally required to maintain any more than those 97 parking spaces.

After being served with plaintiffs' complaint in May of 2018, defendants retained legal counsel, an architect, and an architectural consultant/ADA compliance expert, to assess the claims asserted by plaintiffs. Defendants and their retained experts discussed the ADA violations identified by the plaintiffs and considered how they might be remedied. By August of 2018, the architect had completed plans for the ADA renovation. Those plans were revised in September of 2018, based upon input from the architectural consultant/ADA compliance expert.

Defendants obtained a building permit and construction began in October of 2018. Changes to the handicapped parking were completed by the end of that month and most interior renovations were completed by December 14, 2018. The last of the interior renovations were completed by January of 2019. Finally, once the weather permitted, the defendants replaced the concrete sidewalk in front of the handicapped parking to bring

it into compliance with ADA requirements.  In total, defendants spent approximately $120,000.00 to bring the interior and exterior elements of the restaurant and parking area into compliance with the ADA.  According to their ADA compliance expert, every non-compliant element of the restaurant and parking area identified in plaintiffs' amended complaint has been remedied and the 99 Restaurant in Salem, New Hampshire, now meets or exceeds all ADA accessibility requirements.

A pretrial conference was held on September 4, 2019.  At that conference, plaintiffs conceded that most ADA violations alleged in the amended complaint have been remedied.  They do, however, persist in claiming that:

1.  The restaurant still does not have an adequate number of handicapped-accessible parking spaces;

2.  The restaurant lacks at least one accessible route that connects all accessible building entrances with all accessible spaces; and

3.  The restaurant lacks adequate accessible seating appropriately distributed throughout the facility - specifically, plaintiffs allege that there is no handicapped-accessible seating in the "bar area."[1]

---

[1]     Plaintiffs do not complain about a lack of handicapped-accessible seating at the bar itself.  Rather, they say there is inadequate accessible seating in what they describe as the "bar area."

Defendants say that, with respect to those remaining claims, there are no genuinely disputed material facts and they maintain that they have addressed and remedied each and every alleged deficiency identified in the amended complaint. Defendants also assert that they are entitled to judgment as a matter of law on all of plaintiffs' claims.

## Discussion

I. <u>Accessible Parking Spaces</u>.

In their amended complaint, plaintiffs allege that, as of April of 2018 (i.e., prior to the renovations), the Salem 99 Restaurant maintained only three accessible parking spaces. Those spaces failed to meet the requirements of the ADA in terms of absolute number, signage, surface materials, and the presence of at least one van accessible space. According to the amended complaint, "parking facilities that require more than 100 spaces, such as the defendants' parking facility, must have a minimum of five accessible parking spaces (at least one of which must be a van parking space)." Amended Complaint at para. 65. <u>See also</u> <u>Id</u>. at para. 67 ("The defendants must provide <u>at least</u> <u>five</u> ADA-compliant parking spaces given the restaurant's seating capacity, its high daily volume of guests at peak times, and the number of spaces required by their parking facility.") (emphasis supplied).

Defendants respond by noting that they now have five ADA-compliant handicapped-accessible parking spaces, one of which is van accessible. Plaintiffs do not dispute this. And, according to defendants' architectural and ADA compliance expert, when the restaurant expanded to its current seating capacity of 240 patrons, the town zoning ordinance required that it provide 97 parking spaces (which it did). Affidavit and Report of Walter Blair Adams (document no. 42-4) at 2. Plaintiffs do not dispute this.

Pursuant to the 2010 ADA Standards for Accessible Design,[2] facilities that provide between 76 and 100 parking spaces must maintain a minimum of <u>four</u> accessible parking spaces. <u>Id</u>. at Section 208 Parking Spaces. <u>See also</u> <u>Id</u>. at Table 208.2. Given the number of parking spaces maintained by defendants for their customers (97), and given the fact that defendants now provide five handicapped-accessible parking spaces (including one van-accessible space), they are in compliance with (and, indeed, have exceeded) the ADA's requirements.

Plaintiffs now argue that defendants should, in fact, maintain <u>six</u> handicapped-accessible parking spaces (an argument

---

[2]    Available at https://www.ada.gov/regs2010/2010ADAStandards/2010ADAstandards.htm

inconsistent with their amended complaint). The individually
named plaintiff, Mr. Theodore, "estimates" that "based on
personal observation," the restaurant provides more than 150
parking spaces (which would, under the ADA Standards, require 6
accessible parking spaces). <u>See</u> Affidavit of Dino Theodore
(document no. 36-2) at para. 23. <u>See also</u> Plaintiffs'
Memorandum (document no. 43-1) at 4 ("Based on Mr. Theodore's
observations, the 99's parking facility provides more than 150
spaces in total. His estimate, based on personal observation,
is that a number closer to 200 parking spaces, more or less, are
occupied on average by vehicles belonging to The 99's
customers.").

Such speculation is not sufficient to contradict
defendants' evidence and their expert's affidavit and report.
Nor is it enough to create a genuine dispute as to a material
fact. The undisputed record evidence reveals that: (1) the
Salem 99 Restaurant is, by zoning ordinance, required to provide
97 parking spaces; (2) under the ADA Standards, it is,
therefore, required to provide a minimum of four accessible
spaces; and (3) it currently provides five accessible spaces
(one of which is van accessible).

It is, of course, conceivable that some customers of the
Salem 99 Restaurant may, on occasion, park in spots or areas not
directly owned, maintained, or controlled by defendants (e.g.,
on-street parking, in an adjoining parking facility, or in
spaces allocated to an adjacent business in the shopping plaza,
like K-Mart, Walgreens, or Market Basket).  Plaintiffs have not,
however, provided any legal authority for the proposition that
defendants must account for those remote parking spaces when
calculating how many handicapped-accessible spaces they must
provide immediately adjacent to the restaurant.

As to plaintiffs' claim that defendants fail to provide
adequate handicapped-accessible parking spaces at their Salem 99
Restaurant, there are no genuinely disputed material facts and
defendants are entitled to judgment as a matter of law.

II.  <u>Accessible Routes and Transition Strips</u>.

Next, plaintiffs assert that defendants have failed to
create an ADA-compliant wheelchair-accessible route within the
facility and to the public rest rooms.  <u>See generally</u> 2010 ADA
Standards for Accessible Design, § 206.2.4 ("At least <u>one</u>
<u>accessible route</u> shall connect accessible building or facility
entrances with all accessible spaces and elements within the
building or facility which are otherwise connected by a

circulation path.) (emphasis supplied).  Specifically,

plaintiffs say the transitions strips between the tile floor

surface and the carpeted floor surface exceed the height

permitted on an "accessible route:"

> The plaintiffs dispute the allegation that there is an
> accessible route within the building to accessible
> seating areas and an accessible route to the public
> toilet rooms in compliance with ADA Standards.  ADA
> Standard 403.4 states, "Changes in level shall comply
> with 303."  ADA Standard 303 states, "Changes in level
> of 1/4 inch (6.4 mm) high maximum shall be permitted
> to be vertical."  Based upon Mr. Theodore's visual and
> tactile observation, the transition strips separating
> the tile of the bar area floor from the thick
> carpeting of the dining area "exceed the maximum
> permissible height of one-quarter inch under Standard
> 303.2.  They present a wheelchair-tipping hazard.  The
> same transition strips are still present in other
> parts of The 99."

Plaintiffs' Memorandum at 5 (quoting Affidavit of Dino Theodore

(document no. 36-2) at para. 52).


Again, however, plaintiffs' assertions are based upon

imprecise "visual and tactile observation" at best, and mere

speculation at worst, rather than upon objective evidence.  Mr.

Theodore does not claim to have actually measured the height of

the transition strips.  Instead, he has only "estimated" that

they exceed the permissible height based upon a "visual" and

"tactile" observation.  Defendants, on the other hand, say:

> The Salem 99 contains an accessible route into the
> building, an accessible route within the building to
> accessible seating areas, and an accessible route to
> the public toilet rooms in compliance with ADA
> Standards, Section 206, including Section 206.2.5 for
> Restaurants and Cafeterias.
>
> All noncompliant elevation changes along these
> accessible routes have been eliminated.
>
> None of the transitions from one flooring type
> (carpet) to another flooring type (tile) along these
> accessible routes are more than 1/4 inch.

Defendants' Memorandum (document no. 42-1) at 2. In support of
those assertions, defendants rely upon the report prepared by
their expert and his affidavit. And, critically, defendants'
expert actually "took measurements to confirm" that the work
performed at the Salem 99 Restaurant "was within the dimensional
requirements and compliant with ADA standards." Expert Report
of Walter Adams (document no. 42-4) at 2. See also Affidavit of
Walter Adams (document no. 42-2) at para. 8 ("None of the
transitions [along the accessible path within the restaurant]
from one flooring type (carpet) to another flooring type (tile)
are more than 1/4 inch.").

As to plaintiffs' claim that there are impermissibly high
transition strips along the accessible route throughout the
restaurant and to the restrooms, there are no genuinely disputed

material facts and defendants are entitled to judgment as a matter of law.[3]

III. Adequate Dispersed Seating.

In their amended complaint, plaintiffs alleged that "at least 12 of the 240 seating spaces in the defendants' restaurant must be wheelchair accessible spaces distributed proportionally throughout the dining area *and* the bar area with the same sight lines to the restaurant's many flat screen televisions and equal access to restroom facilities." Amended Complaint at para. 75 (emphasis in original). At this juncture, plaintiffs concede that the Salem 99 Restaurant provides an adequate number of handicapped-accessible seats. But, say plaintiffs, there is no wheelchair-accessible seating in what they describe as the "bar area" of the Salem 99 Restaurant. That, they claim, runs afoul of ADA Standard 226.2, which provides, in relevant part, that "Dining surfaces . . . shall be dispersed throughout the space or facility containing dining surfaces." (emphasis supplied).

---

[3]    Parenthetically, the court notes that the transition strips about which plaintiffs seem to complain (i.e., those pictured in their legal memorandum and those that Mr. Theodore estimates exceed 1/4 inch in height) do not appear to be along the "accessible path" throughout the restaurant. Consequently, even if plaintiffs had introduced admissible evidence that those strips exceed ADA height restrictions (and they have not), they would not have demonstrated an ADA violation.

Plaintiffs assert that the lack of wheelchair-accessible seating in the "bar area" amounts to unlawful segregation and "relegates persons with disabilities to the status of second-class citizens." Plaintiffs' Memorandum (document no. 43-1) at 8.

In response, defendants note that the ADA standards do not require restaurants to provide wheelchair access to every area in the facility. Rather, those standards require that: (1) "at least 5 percent of the seating spaces and standing spaces at the dining surfaces shall" be handicapped accessible; and (2) such handicapped-accessible seating "shall be dispersed throughout the space or facility." ADA Standards for Accessible Design, §§ 226.1 and 226.2. And, following the ADA renovations, it is undisputed that the Salem 99 Restaurant now provides 12 wheelchair-accessible seating spaces (i.e., five percent of the 240 total seating space in the restaurant). As to plaintiffs' claim that there is inadequate accessible seating in what plaintiffs describe as the "bar area," defendants' expert's affidavit counters:

> The area surrounding the bar at the Salem 99 includes
> high and low top tables and booths. There are nine
> accessible wheelchair seating and table positions at
> low top tables in the area of the bar. Four of those
> accessible seating positions are within 11-feet of the
> bar and include a view of the bar and all of the
> television screens around the bar. There is no
> requirement in the ADA that wheelchair accessible

seating be placed in particular areas of a restaurant,
such as a bar area. Instead, the ADA only requires
that wheelchair accessible seating areas be disbursed
throughout a facility.

Affidavit of Walter Adams (document no. 42-2) at para. 9. <u>See</u>
<u>also</u> Floor Plans of the Salem 99 Restaurant (document no. 42-5)
at 1 and 2 (depicting the location of all accessible seating).


It is unclear how plaintiffs have defined the so-called
"bar area" (except to exclude each of the 12 distinct
handicapped-accessible seating positions now available in the
facility). The interior space of the Salem 99 Restaurant is
open and laid out on a single floor (i.e., the are no walls
delineating separate dining rooms or dining areas, nor is there
a lower level or upper level providing dining surfaces). At the
center of that space is a bar, with approximately 30 seats or
stools surrounding it. Dining tables of various sorts (i.e.,
low tables, booths, and high-top tables) are then organized in
the space around that central bar. Aside from those 30 seats at
the bar itself, it is difficult to describe with any specificity
a distinct area that might reasonably be called the "bar area."
While the "waiting area," "foyer," and restrooms are clearly
defined spaces in the restaurant (as shown on the floor plans),

the distinction between what plaintiffs call the "bar area" and the "dining area" is far less clear.[4]

Nevertheless, the caselaw on this issue supports defendants' view that the ADA and applicable regulations do not require the restaurant to have accessible seating in every area of the facility.  Rather, accessible seating must be "dispersed throughout the space or facility."  So, for example, the District Court for the Northern District of California has concluded that, "the 5% standard applies to the restaurant as a whole and does not impose a separate requirement for booth seating."  Paulick v. Starwood Hotels & Resorts Worldwide, Inc., No. C-10-01919 JCS, 2012 WL 2990760, at *15 (N.D. Cal. July 20, 2012).  See also Sanford v. Del Taco, Inc., No. 204CV2154 GEB EFB, 2006 WL 2669351, at *3 (E.D. Cal. Sept. 18, 2006) (holding that, provided the facility offers at least five percent accessible seating, there is no requirement that both table and booth seating be accessible).

---

[4]     The open layout of the Salem 99 Restaurant and central location of the bar distinguish it from restaurants that offer, for example, outdoor patio seating, a veranda, or deck seating. Such distinct dining areas are typically easy to define and, because they arguably provide patrons with a different dining experience to that offered by the indoor dining room, they might, under certain circumstances, be required to offer handicapped-accessible seating.  This is not such a case.

Plaintiffs have not identified any precedent - whether
binding or merely persuasive - that supports their view that the
ADA compels defendants to provide accessible seating in what
plaintiffs have defined as the "bar area." The pertinent
regulations require only that accessible seating shall be
"dispersed throughout the space or facility containing dining
surfaces." The record evidence plainly establishes that
defendants have complied with that "dispersal" requirement.
See, e.g., Floor Plans of the Salem 99 Restaurant (document no.
42-5) at 1 and 2.

Moreover, even if the ADA did require defendants to
provide some accessible seating in an ill-defined, so-called
"bar area," they have done so. As shown on the floor plans,
Table 1 and Table 2 (both of which provide accessible seating)
can fairly be described as being within the "bar area" (indeed,
as noted by defendants' expert, one might reasonably argue that
Tables 3, 4, and 5 also provide accessible seating in the "bar
area"). Table 1 and Table 2 provide accessible seating
positions "within 11-feet of the bar and include a view of the
bar and all of the television screens around the bar."
Affidavit of Walter Adams, at para. 9. See generally Wilson v.
Norbreck LLC, No. S-04-690 DFL JFM, 2006 WL 2651139, at *2-3
(E.D. Cal. Sept. 15, 2006) (noting that "plaintiff has not shown

that the 'bar area' is a discrete eating area limited to the
seats at the actual bar and the booths across from the bar.
Rather, the seating includes the tables in the adjoining space
. . . which is not distinct or closed off from the bar" and
concluding that even if there were no accessible seating at the
bar itself, there were numerous accessible places at tables in
the immediately adjoining space "such that the 5% requirement is
easily met at what can fairly be described as the 'bar area.'").

IV.  <u>Plaintiffs' Claims are Moot</u>.

     A case become moot and no longer presents a "case" or
"controversy" for purposes of Article III when the issues
presented by the plaintiff's complaint have been addressed or
the underlying dispute has been resolved.  As the Supreme Court
has noted:

> A case becomes moot — and therefore no longer a "Case"
> or "Controversy" for purposes of Article III - when
> the issues presented are no longer live or the parties
> lack a legally cognizable interest in the outcome.  No
> matter how vehemently the parties continue to dispute
> the lawfulness of the conduct that precipitated the
> lawsuit, the case is moot if the dispute is no longer
> embedded in any actual controversy about the
> plaintiffs' particular legal rights.

<u>Already, LLC v. Nike, Inc.</u>, 568 U.S. 85, 91 (2013) (citations
and internal punctuation omitted).  Nevertheless, the Court has
recognized that:

> a defendant cannot automatically moot a case simply by
> ending its unlawful conduct once sued.  Otherwise, a
> defendant could engage in unlawful conduct, stop when
> sued to have the case declared moot, then pick up
> where he left off, repeating this cycle until he
> achieves all his unlawful ends.  Given this concern,
> our cases have explained that a defendant claiming
> that its voluntary compliance moots a case bears the
> formidable burden of showing that it is absolutely
> clear the allegedly wrongful behavior could not
> reasonably be expected to recur.

Id.

Having remedied all alleged structural ADA violations identified in plaintiffs' amended complaint, and having made the Salem 99 Restaurant fully compliant with the ADA, defendants urge the court to grant them summary judgment, declare plaintiffs' claims moot, deny their request for prospective injunctive relief, and close the case.  In short, defendants assert that given the substantial sums they have invested in permanent physical alterations that make the restaurant compliant with ADA requirements, there is no reasonable possibility that they will undo those structural changes to take the restaurant out of compliance with the ADA.  Thus, say defendants, they have met their "formidable burden" and have demonstrated that it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  Id.

Plaintiffs, on the other hand, suggest that their claims are not moot, vaguely asserting that "even if every offending structure at The 99 Restaurant has been fixed, a real and immediate threat of future injury by the defendant still exists." Plaintiffs' Memorandum (document no. 43-1) at 1 (citations and internal punctuation omitted). Plaintiffs also point out that "all of the defendants' efforts at bringing The 99 into ADA compliance were in response to this lawsuit" and argue that "the defendants have demonstrated no 'genuine change of heart' regarding ADA compliance.'" Id. at 15-16 (citation omitted). But, of course, defendants have recognized the obligations imposed under the ADA and have spent approximately $120,000 to bring the restaurant into compliance. Perhaps more substantively, plaintiffs assert that "[e]mployees of the defendants do not receive any ADA-compliance training" nor have defendants established a "formal plan . . . to monitor ADA compliance at The 99 on an ongoing basis." Id. at 16. Finally, plaintiffs claim that:

> The remediation work at The 99 was done entirely in response to the present lawsuit and with the sole objective of mooting the plaintiffs' claims for attorneys' fees and costs under Buckhannon Bd. & Care Home, Inc. v. W. Va. Dept. of Health & Human Res., 532 U.S. 598 (2001). The defendants have failed to establish that ADA violations are not reasonably likely to recur at The 99.

Id. at 18.  Thus, say plaintiffs, their claims against
defendants are not moot.  And, at a minimum, the court should
issue a permanent injunction, requiring defendants to train
their employees about ADA requirements and to monitor the
restaurant's ongoing compliance with ADA accessibility
requirements.  Finally, once the court has granted such
injunctive relief, it should then award plaintiffs reasonable
attorney's fees.  The court disagrees.


Plaintiffs appear to recognize that a "litigant's interest
in a possible award of attorneys' fees is not enough to create a
justiciable case or controversy if none exists on the merits of
the underlying claim."  Goodwin v. C.N.J., Inc., 436 F.3d 44, 51
(1st Cir. 2006).  See generally Sinapi v. R.I. Bd. of Bar
Examiners, 910 F.3d 544, 551 (1st Cir. 2018) (noting the Supreme
Court's rejection of the "catalyst" theory as a way to establish
prevailing party status, and reaffirming the principle that
attorney's fees are not proper when a plaintiff has failed to
obtain at least some court-ordered relief based on the merits of
plaintiff's claim).  Accordingly, plaintiffs seem, albeit
implicitly, to acknowledge that the mere fact that defendants
brought their restaurant into compliance with the ADA in
response to plaintiffs' complaint is not sufficient, standing
alone, to warrant an award of attorney's fees.  Consequently,

they urge the court to conclude that defendants lack required policies to ensure ongoing compliance with the ADA and, therefore, injunctive relief is required to force them to implement and follow such policies. Yet, plaintiffs have failed to provide citations to any legal authority supporting their suggestion that defendants are required by the ADA to maintain "anti-discrimination policies" or that they must implement a formal plan to monitor ongoing compliance with ADA requirements. See generally 42 U.S.C.A. § 12188 (providing that, where appropriate, a court may order a defendant to modify existing policies that are not consistent with requirements of the ADA).

Moreover, that plaintiffs' suit prompted defendants to renovate the restaurant says little about whether defendants are likely to violate the ADA in the future, thereby warranting ongoing injunctive relief. See generally Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1184 (11th Cir. 2007) (discussing factors that should be considered when determining whether a plaintiff's claims have been mooted by a defendant's voluntary cessation of unlawful conduct). And, while defendants' remediation work can hardly be said to have been entirely "voluntary," defendants did respond promptly to plaintiffs' assertions that the restaurant failed to comply with several ADA requirements. As noted above, they immediately

hired legal counsel, an architect, and an ADA compliance expert to advise them on how best to address the issues identified by plaintiffs. Then, they promptly developed architectural plans to address all of the restaurant's ADA compliance issues. Renovation plans were developed quickly and defendants promptly began substantial interior and exterior construction to bring the restaurant into compliance.

In cases such as this - that is, those involving architectural barriers to entry or movement that are non-compliant with ADA requirements - a substantial weight of authority supports the view that once those architectural barriers have been removed, a plaintiff's ADA claims are moot.[5]

> ADA-architectural-barrier cases are a unique subset of voluntary-cessation-doctrine cases. While these cases are not always a perfect fit within the framework of the three factors discussed in Sheely, the nature of structural modifications (as opposed to simply a change in a discriminatory policy) still satisfies the ultimate question that the voluntary-cessation doctrine asks (i.e., is it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur). Several courts have found that where structural modifications have been undertaken to

---

[5]     The court recognizes that two distinct inquiries are involved here. First, whether plaintiffs' claims are moot (an issue as to which defendants bear a "formidable burden") and, second, whether a permanent injunction is warranted to ensure defendants' future compliance with ADA requirements (an issue as to which plaintiffs bear the burden of proof). See generally Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190 (2000).

make the facility ADA compliant the case is moot.
See, e.g., Nat'l Alliance for Accessability, Inc. v.
Walgreen Co., 2011 WL 5975809, *3 (M.D. Fla. Nov. 28,
2011) (collecting cases). The fundamental rationale
supporting these cases is that the alleged
discrimination cannot reasonably be expected to recur
since structural modifications permanently undo the
offending conduct. Kallen v. J.R. Eight, Inc., 775 F.
Supp. 2d 1374, 1379 (S.D. Fla. 2011) (King, J.) ("It
is untenable for Plaintiff to suggest that once the
renovations are completed they could be undone.")
(internal punctuation & quotation omitted).

Houston v. 7-Eleven, Inc., 2014 WL 351970, at *2 (S.D. Fla. Jan.

31, 2014). See also Dalton v. NPC Int'l, Inc., 932 F.3d 693,

695 (8th Cir. 2019) ("This court affirms the conclusion that the

parking lot violations are moot. . . The district court

concluded that these remediations are 'permanent' such that 'the

violations are not reasonably likely to recur.' Dalton does not

challenge these conclusions about the parking lot on appeal.

His parking lot claim is moot."); Boitnott v. Border Foods,

Inc., 361 F. Supp. 3d 858, 866 (D. Minn. 2019) ("ADA claims are

moot when a defendant has presented evidence that modifications

to its property have remedied the ADA violations identified in

the complaint. . . . The record before the Court clearly

demonstrates that Border Foods has remedied the ADA violations

alleged in the amended complaint . . . These alleged ADA

violations will not recur unless Defendants take affirmative

steps to remove or alter the ADA-compliant doors, accessible

seating, and bathroom fixtures Defendants installed, which are

permanent fixtures or features."); Moras v. Albertson's LLC,
2016 WL 5661985, at *3 (D. Idaho Sept. 29, 2016) ("[Defendant's]
remediation efforts were permanent structural improvements,
which make reversion to non-compliance impractical.  [Plaintiff]
has not offered any evidence that [defendant's] efforts are
insufficient to bring these locations into ADA compliance.
Thus, these actions taken by [defendant] render this claim moot
by reason of voluntary remediation."); LaFleur v. S & A Family,
LLC, No. SA CV 13-01297-MWF, 2014 WL 2212018, at *4 (C.D. Cal.
May 13, 2014) ("S&A has made permanent changes to the handicap
parking spaces and adjacent access aisles in the Shopping Center
by removing the concrete sidewalk, constructing new concrete
curb ramps and access aisles, and apparently grinding the
surface of the parking spaces and access aisles.  These
permanent changes thus eradicate the alleged barrier - the non-
flat surfaces of the handicap parking spaces and access aisles -
which prevented LaFleur from accessing the Shopping Center.
Because these renovations are permanent, it cannot reasonably be
expected that the alleged barriers will recur in the near
future.  LaFleur has not argued otherwise.  Accordingly, the
Court finds that the ADA claim is moot."); Ramirez v. Golden
Creme Donuts, 2013 WL 6056660, at *2 (N.D. Cal. Nov. 15, 2013)
("The second issue is that remedying a violation by rendering a
bathroom accessible more clearly establishes mootness than

merely removing all access to the bathroom by anyone. That is because structural improvements are less likely altered. For this reason, courts readily conclude that successful remedial efforts moot ADA claims.") (collecting cases). See also Davis v. Morris-Walker, LTD, 922 F.3d 868, 870–71 (8th Cir. 2019); Langer v. McKelvy, 677 F. App'x 363, 364 (9th Cir. 2017).

Finally, it is, perhaps, appropriate to revisit the precise nature of plaintiffs' complaint. In it, plaintiffs complain of various physical architectural barriers to access that previously existed at the Salem 99 Restaurant. Plaintiffs also generally complain about defendants' failure to "adopt adequate non-discrimination policies" and the failure "to modify their policies to accommodate disabled persons." Amended Complaint at para. 90. But, plaintiffs have never claimed that defendants maintained an unlawful policy or practice of discriminating against the disabled such as, for example, a policy of refusing to permit service animals to enter the restaurant, or a policy of refusing to seat individuals with disabilities. And, of course, there is a legally significant difference between actively maintaining a policy of non-compliance with the ADA (or a policy that is directly at odds with the ADA's requirements), and simply failing to comply with all of the ADA's accessibility requirements. This case, quite plainly, involves the latter.

Plaintiffs' efforts to suggest that defendants' prior non-compliance with ADA requirements concerning architectural barriers was the product of corporate policies (or the lack thereof) are unavailing. Consequently, plaintiffs' assertion that a permanent injunction is required to ensure that defendants do not, at some future date, implement a policy that is at odds with the ADA is unpersuasive. The District Court for the District of Minnesota addressed and rejected similar arguments, reasoning:

> Boitnott argues that his claims cannot be moot to the extent that he seeks an order directing Defendants to modify their policies, practices, and procedures to ensure ongoing ADA compliance. The ADA defines discrimination to include "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities." 42 U.S.C. § 12182(b)(2)(A)(ii). And Boitnott's amended complaint generally alleges that Defendants have "fail[ed] to adopt and implement adequate ADA related policies, procedures, and practices." But Boitnott does not identify any particular policy, practice, or procedure that Defendants have failed to reasonably modify. He instead relies on inferences derived from claimed architectural barriers that have undisputedly been remedied. This reasoning is unavailing. The record reflects that Border Foods promptly and comprehensively acknowledged and remedied not only the ADA violations Boitnott identified in his complaint, but also ADA violations that Boitnott did not identify. To the extent that Defendants' policies, practices, or procedures may have been inadequate when Boitnott commenced this lawsuit, the record reflects that Defendants voluntarily remedied those inadequacies.

<u>Boitnott v. Border Foods, Inc.</u>, 361 F. Supp. 3d 858, 867–68 (D. Minn. 2019).

## Conclusion

Because defendants have undertaken substantial, permanent structural renovations to bring the Salem 99 Restaurant into compliance with the ADA, and because it is extremely unlikely that defendants will undo those structural changes in a way that creates future violations of the ADA, plaintiffs' ADA claims are now moot. Given the undisputed facts presented, injunctive relief is not warranted.

For the foregoing reasons, as well as those set forth in defendants' various legal memoranda, the court concludes that there are no genuine disputes with regard to any material facts and, as a matter of law, defendants have remedied all ADA violations identified in the amended complaint, and the Salem 99 Restaurant is now compliant with the accessibility requirements of the ADA. Plaintiffs have failed to demonstrate that ongoing monitoring of defendants' conduct or the issuance of a permanent injunction directing defendants to maintain compliance with the ADA is necessary.

Plaintiffs' motion for partial summary judgment (document no. 36) is denied, and defendants' motion for summary judgment (document no. 42) is granted. The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

October 2, 2019

cc:  Nicholas S. Guerrera, Esq.
     James L. Frederick, Esq.
     Laurence B. Cote, Esq.